ROBERT C. SALLIES AND MARGIE G. SALLIES, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1035–80.     Filed July 18, 1984.

*Bryan M. Dench*, for the petitioners.
*David N. Brodsky*, for the respondent.

CHABOT, *Judge*: Respondent determined a deficiency in Federal individual income tax against petitioners for 1976 in the amount of $33,940. After a concession by petitioners, the issue for decision[1] is whether petitioners are entitled under section 453[2] to use the installment method of reporting gain from the sale of certain real estate.

### FINDINGS OF FACT

Some of the facts have been stipulated; the stipulation and the stipulated exhibits are incorporated herein by this reference.

---

[1] The parties agree that the minimum tax adjustment is derivative and depends on the resolution of the issue in dispute.

[2] Unless indicated otherwise, all section references are to sections of the Internal Revenue Code of 1954 as in effect for the year in issue.

When the petition in the instant case was filed, petitioners Robert C. Sallies (hereinafter sometimes referred to as Sallies) and Margie G. Sallies, husband and wife, resided in Westbrook, Maine.

In 1959, Sallies acquired the Oxford Hills Publishing Co. (hereinafter sometimes referred to as Oxford). Oxford, a Maine business corporation, was a family-run business involved principally with newspaper publishing, printing, and related businesses, carried out under the name of the Advertiser-Democrat. Oxford had been in the family since it was established, in 1886.

Petitione: s owned all of the outstanding capital stock of Oxford.[3] They also owned, as joint tenants, the real estate and building in Norway, Maine, where Oxford conducted its business. The real estate and building were encumbered by a $125,000 mortgage taken by the Norway National Bank (hereinafter sometimes referred to as the bank). This mortgage is evidenced by a mortgage note dated August 28, 1972. The interest on this note is stated as "1½% above Maine prime rate".

On March 17, 1976, petitioners borrowed $17,000 from the bank to buy real estate next to Oxford's building. This loan is evidenced by a promissory note dated March 17, 1976. The stated annual interest rate on this note is 9.5 percent. The bank did not take a security interest or mortgage in this real estate. Petitioners bought this real estate so they could make a driveway for trucks that delivered newsprint. For many years, Oxford had trouble with parking for its staff and egress for the newsprint trucks. Many times during the noon hour, cars were blocked in by newsprint trucks which were loading or unloading.

Petitioners also owned real estate in Norway, Maine, near Oxford's building. (Hereinafter, the real estate and building where Oxford conducted its business and the real estate petitioners bought to make a driveway are sometimes referred to collectively as the business real estate, and the other real estate petitioners owned in Norway, Maine, is sometimes referred to as the other real estate. The business real estate and the other real estate are hereinafter sometimes referred to collectively as the real estate.)

---

[3] So stipulated. But see note 5 *infra.*

Sometime in the late spring of 1976, petitioners were approached by Howard A. James (hereinafter sometimes referred to as James), the president of James Newspapers, Inc. (hereinafter sometimes referred to as Newspapers), to discuss the possibility of selling Oxford. In early June 1976, Newspapers tentatively agreed to buy the real estate and also to buy either all of the Oxford stock or all of its operating assets.

In the beginning of the negotiations, Sallies told James he wanted to sell Oxford only for cash. James told Sallies that he could not raise the cash necessary to buy Oxford at the price Sallies was asking. After further negotiations, James suggested to Sallies an installment contract sale. James had been reading about installment contracts and had recently bought another newspaper, the Rumsford Times, under an installment contract. In connection with the purchase of the Rumsford Times, James borrowed enough money from the Berlin City Bank to fund the downpayment and, at the same time, provide operating capital. James liked this arrangement because it enabled him to buy the Rumsford Times and obtain some operating capital using little or no personal funds. James had no cash available to purchase Oxford. James' intention in structuring the purchase of Oxford as an installment sale was to be able to fund the downpayment and provide operating capital by the use of borrowed funds.

On June 21, 1976, petitioners, Newspapers (through James, its president), and James (individually), signed a letter of intent regarding the sale of Oxford and the real estate. Among the statements made in the letter of intent are the following:

1. [Newspapers] will either purchase from the two of you [petitioners] all of the outstanding stock of Oxford or will purchase from Oxford itself all of its operating assets plus, in either event, real estate associated with the business, i.e., the buildings occupied by the business itself and certain adjoining real estate on or near your business address of 2 Bridge Street in Norway, Maine. We are doing computations to test whether it will be to your advantage to have the transaction treated as an installment sale, and if such turns out to be the case, then [Newspapers] will purchase stock rather than assets, plus, of course, the associated real estate.

2. The overall approach is to provide you with an annual pre-tax income of $24,000, which is the equivalent of an 8% return on $300,000. While doing this, we will also make annual payments over a period not exceeding fifteen years, so as to provide you, after capital gains taxes, with the amount of $300,000.

3. [Newspapers] will transfer to you not less than $20,000 per year, after capital gains tax, although it can be more at the option of [Newspapers]. Each transfer will be considered a contribution to a Capital Account, with contributions to be cumulative. We will assume earnings on the cumulative Capital Account of 7% so that in any particular year [Newspapers] will pay to you the difference between $24,000 and an amount representing 7% on the Capital Account which has been accumulated up to the beginning of the year in question. For example, if at a particular January 1 the cumulative Capital Account amounts to $60,000, then you would be entitled during the year commencing with that January 1, to receive $24,000 minus $4,200, or, $19,800. The funds in the Capital Account will be invested by you at your discretion, except that we at all times will be entitled to credit the 7% on the funds which have been placed in the account in order to compute the annual $24,000 payment. It is understood that the $24,000 will constitute ordinary income to you.

4. The real estate, none of which is owned by Oxford but which is owned by the two of you individually, and which is to be transferred, is appraised by you at approximately $270,000, and there is an existing mortgage debt of $75,000 plus a personal note of $17,000. We expect to be able to mortgage the property at 80% of its value, or $216,000, out of which we will pay off the existing indebtedness of $92,000, leaving a net of $124,000. If we are unable to obtain a loan in the amount of $216,000, we will have the option of taking a smaller loan and if so, it is understood that you will give us a second mortgage equal to the difference between the $216,000 desired and the amount which we can obtain. The amount of the second mortgage will be deducted from the down payment which we will make at the time of closing. The down payment is to be computed at not more than 29% of the total purchase price,[4] the amount of which has not been computed as yet, but which will be calculated on the basis of transfer of funds necessary to produce for you the annual income of $24,000 described above, plus the acceleration of payments, if we wish to make them.

We did not discuss the terms of the second mortgage, but I [James] suggest that the amount, whatever it may be, could be amortized over a period of 15 years at 8%. Payments due under the second mortgage, if any, would not in any way affect the guaranteed annual income of $24,000.

Sallies reviewed the letter of intent before signing it to make sure that (1) Newspapers would assume the mortgage on the real estate and the $17,000 promissory note; (2) the payment schedule would meet petitioners' needs; (3) he understood petitioners' obligations with respect to any business Oxford did before it was actually sold to Newspapers; and (4) petitioners

---

[4]Sallies testified that he underlined these words in the copy of the letter of intent from which the exhibit copy was made. To the extent that the underlining of these words by Sallies indicates petitioners' intent, we take note. Otherwise, we do not give any greater weight to these underlined words.

agreed not to compete by starting up another newspaper business.

Sallies' accountant told him it was important that petitioners not accept more than 29 percent of the sales price as a downpayment, so that the transaction could qualify for the installment method of accounting for gain. After reviewing the letter of intent, Sallies was satisfied that the transaction would meet these requirements. (See note 4 *supra*.)

As Sallies understood it, Newspapers' assumption of the mortgage note and the promissory note meant that petitioners would not have to make any more payments on these notes, and that Newspapers would make the payments. Further, as Sallies understood it, if Newspapers failed to make the payments, then petitioners would in some way take back the business and once again would be responsible for the mortgage payments.

Neil L. Dow (hereinafter sometimes referred to as Dow), petitioners' attorney in connection with the sale of Oxford, reviewed the letter of intent but did not give petitioners advice on the tax aspects of the transaction.

Pursuant to the letter of intent, a final purchase and sale agreement (hereinafter sometimes referred to as the agreement) was drawn. The agreement was executed on June 30, 1976, by petitioners, by Newspapers (through its president, James), and by James (in his individual capacity).

Under the agreement, Newspapers agreed to buy all of the Oxford stock from petitioners[5] and pay them $200,000.[6] Also, under the agreement, Newspapers agreed to buy from petition-

---

[5]The agreement states that petitioners "are the owners of all the outstanding shares of capital stock" of Oxford and the parties have so stipulated. The memorandum of closing, however, indicates that the certificate for 1 share of Oxford's stock was in the name of Dow, petitioners' attorney, and was a "qualifying share". The parties do not explain the apparent inconsistency between their stipulation and the memorandum of closing.

[6]The sale of the Oxford stock was structured as an installment sale. Petitioners reported the gain from the sale of the stock on the installment method. The reporting of this gain on the installment method is not in dispute in the instant case. The parties do not explain why the sale of the Oxford stock and the sale of the real estate, which on the face of things looks like part and parcel of one transaction, were treated for Federal income tax purposes as two separate transactions. We note, however, that if both sales were treated as one transaction, and the payment of petitioners' liabilities were considered a payment in the year of sale, then the payments received in the year of sale would exceed 30 percent of the selling price (i.e., the price of the stock plus the price of the real estate), and none of the gain on the sale of the stock would qualify for the installment method of reporting under sec. 453. Respondent does not challenge petitioners' treatment of the sale of the Oxford stock as a separate sale and we do not disturb this treatment. See *Monson v. Commissioner*, 79 T.C. 827, 837–845 (1982).

ers the real estate and pay them $270,000. Specifically, the agreement provides as follows:

2.2 The purchase price of the real estate shall be $270,000 including outstanding indebtedness of $92,000 ($75,000 of which relates to the Business Real Estate and $17,000 which relates to the Other Real Estate). On the date hereof Oxford shall assume the outstanding indebtedness and shall pay to [petitioners] the sum of $28,000, and thereafter, commencing January 2, 1977 through December 2, 1991, Oxford shall make 180 monthly payments of $833.33 each with monthly interest payments at 7% per annum on the unpaid balance. Schedule III-2.2 sets forth these payments in detail. On January 2, 1977 [Newspapers] will pay interest from the date of this agreement on $150,000 at the rate of 7% per annum, total $5,250.[7]

On June 30, 1976, the same day the agreement was executed, the closing of the sale of Oxford's stock and the real estate took place in the board room at the bank's offices. The following people attended the closing: James, both individually and as Newspapers' president; John E. Hess (hereinafter sometimes referred to as Hess), counsel for both Newspapers and James; petitioners; Dow, as counsel for petitioners; and Charles Butts (hereinafter sometimes referred to as Butts), vice president of the bank.

The following are the steps and the order in which the steps occurred as the closing with respect to the sale of the real estate. Firstly, petitioners delivered to Hess a warranty deed which granted the real estate to Newspapers. The warranty deed expressly states that the conveyance of the real estate "is made subject to a prior mortgage" with the bank.

Secondly, Newspapers and petitioners executed a declaration of value.[8]

---

[7]The amounts of outstanding indebtedness listed in the agreement ($75,000 as to the business real estate and $17,000 as to the other real estate, or a total of $92,000) were approximations of the amounts. The figures in the agreement were changed sometime during the closing to reflect the actual outstanding indebtedness at the date of the closing. The changes were made by crossing out the figures in the agreement and substituting new, handwritten figures in the amounts of $76,037.76, as to the business real estate indebtedness, $17,128.32, as to the other real estate indebtedness, and, as to the total indebtedness, $93,166.08. Schedule III-2.2, referred to in this extract from the agreement, shows the downpayment as being $26,833.92, so as to retain a $150,000 balance. However, the $28,000 amount in this extract from the agreement was not changed. The parties do not explain this inconsistency, which in any event does not affect our conclusions in the instant case.

[8]The parties do not explain what a declaration of value is and during direct examination, Sallies could not recall what it was. The parties have not raised any arguments which depend on a finding of what such declaration is. We do not make any finding as to what it is and we leave the parties where we find them.

Thirdly, Newspapers, as holder of the real estate, restructured its relationship with the bank. To do this, James, Hess, and Butts left the board room and went into Butts' office in the loan section of the bank. Then Newspapers borrowed $210,000 from the bank. James, as the president of Newspapers, signed a promissory note evidencing this loan and a mortgage note which gave the bank a first security interest in the real estate. The annual interest rate under the promissory note was 9 percent. On June 30, 1976, the Maine prime interest rate was 8½ percent. The amount borrowed by Newspapers, $210,000, was deposited in Newspapers' account at the bank, and the bank delivered to James a deposit receipt which recorded this transaction. Finally, Newspapers delivered checks, drawn on the just-established account, to the bank in the amounts of $17,128.32 and $76,037.76, for a total of $93,166.08. These checks satisfied petitioners' liabilities on their mortgage note and their promissory note. Petitioners were not liable, in any capacity, for the $210,000 borrowed by Newspapers and secured by the real estate.

Fourthly, James, Hess, and Butts returned to the board room. Butts delivered to petitioners the mortgage note dated August 28, 1972, and the promissory note dated March 17, 1976, both stamped "PAID".

Fifthly, a check for the amount of $26,833.92 was delivered to petitioners. This represented the downpayment of the purchase price of $270,000 for the real estate. (See note 7 *supra.*) As to the balance of the purchase price, $150,000, James delivered to petitioners a promissory note, from Newspapers and guaranteed by James, and a second mortgage deed and security agreement executed by Oxford.

Thus, the $270,000 purchase price was paid by Newspapers to petitioners, as shown in table 1.

| Form of payment | Amount |
| --- | --- |
| Check to petitioners | $26,833.92 |
| Payment of petitioners' mortgage note and promissory note to the bank | 93,166.08 |
| Promissory note to petitioners | 150,000.00 |
| Selling price of the real estate | 270,000.00 |

Finally, petitioners delivered a check for the amount of $944.11 to Newspapers. This represented one-fourth of the estimated real estate taxes for 1976.

Petitioners' adjusted basis in the real estate at the time of the sale was $184,858.

---

Newspapers' payment to the bank of petitioners' liabilities on their mortgage note and their promissory note constituted a payment in the year of the sale of the real estate.

In the year of the sale of the real estate, petitioners received payments totaling more than 30 percent of the selling price of the real estate.

### OPINION

The general rule is that the entire amount of gain from the sale of property is taxed to the seller in the year of the sale. As an exception to this rule, in certain circumstances, section 453[9] provides that in the case of an installment sale, income

---

[9] Sec. 453 provides, in relevant part, as follows:

SEC. 453. INSTALLMENT METHOD.
(a) DEALERS IN PERSONAL PROPERTY.—
(1) IN GENERAL.—Under regulations prescribed by the Secretary or his delegate, a person who regularly sells or otherwise disposes of personal property on the installment plan may return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the gross profit, realized or to be realized when payment is completed, bears to the total contract price.

\*    \*    \*    \*    \*    \*    \*

(b) SALES OF REALTY AND CASUAL SALES OF PERSONALTY.—
(1) GENERAL RULE.—Income from—
(A) a sale or other disposition of real property, or
(B) a casual sale or other casual disposition of personal property (other than property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year) for a price exceeding $1,000,
may (under regulations prescribed by the Secretary or his delegate) be returned on the basis and in the manner prescribed in subsection (a).
(2) LIMITATION.—Paragraph (1) shall apply—
(A) In the case of a sale or other disposition during a taxable year beginning after December 31, 1953 (whether or not such taxable year ends after the date of enactment of this title), only if in the taxable year of the sale or other disposition—
(i) there are no payments, or
(ii) the payments (exclusive of evidences of indebtedness of the purchaser) do not exceed 30 percent of the selling price.

The revision of the foregoing provisions by sec. 2(a) of the Installment Sales Revision Act of 1980, Pub. L. 96–471, 94 Stat. 2247, does not apply to the years in issue (see note 12 *infra*). The

need not be reported until "actually received". However, under sections 453(b)(1)(A) and 453(b)(2)(A)(ii),[10] this installment sale treatment is not available with regard to a sale of real property if the payments in the year of sale exceed 30 percent of the selling price. In the instant case, the question of whether the 30-percent requirement has been met is determined by the proper treatment of Newspapers' payment of the mortgage and the unsecured debt at the closing.[11]

Petitioners assert that whether the payoff of these encumbrances constitutes a payment in the year of sale depends on whether "the prepayment was part of the bargained-for-exchange between the parties." Petitioners contend that in the instant case, the "prepayment" was not bargained for and thus, they should be allowed to report the gain from the sale on the installment method of reporting.

Respondent contends that the payment of the encumbrances "simultaneously with and as an integral part of the closing of the sale of Oxford constitutes a payment" in 1976 and thus, petitioners received payments in the year of sale which exceeded 30 percent of the total sales price. Thus, respondent concludes that petitioners do not qualify for the installment method of reporting gain.

We agree with respondent's conclusion.

The installment method of reporting was enacted, as shown by its history, to relieve taxpayers who adopted it from having to pay an income tax in the year of sale based on the full amount of anticipated profits when in fact they had received in cash only a small portion of the sales price. Another reason was the difficult and time-consuming effort of appraising the uncertain market value of installment obligations. *Commis-*

---

amendments by secs. 1906(b)(13)[sic](A) and 1951(b)(7)(A) of the Tax Reform Act of 1976, Pub. L. 94–455, 90 Stat. 1520, 1834, 1838, also do not apply to the years in issue.

[10]Both petitioners and respondent cite to sec. 453(b)(2)(B) as the applicable section concerning the 30-percent rule. Paragraph (2) of sec. 453(b) was amended by sec. 1951(b)(7)(A) of the Tax Reform Act of 1976, Pub. L. 94–455, 90 Stat. 1520, 1838, to delete former subpar. (B) of sec. 453(b)(2) and change clause (ii) of then sec. 453(b)(2)(A) to subpar. (B). This amendment, however, was effective for taxable years beginning after Dec. 31, 1976, and thus, is not applicable to the year in issue. Sec. 1951(d), Pub. L. 94–455, 90 Stat. 1841.

[11]Under respondent's theory, petitioners received payments in the year of sale (1976) equal to the downpayment ($26,833.92) plus the paid off encumbrances ($93,166.08), or a total of $120,000. These payments equal about 44 percent of the selling price for the real estate ($270,000).

Under petitioners' theory, they received only one payment in the year of sale—the downpayment ($26,833.92). This payment equals a little less than 10 percent of the selling price for the real estate ($270,000).

*sioner v. South Texas Lumber Co.*, 333 U.S. 496, 503 (1948). Since section 453 is an exception to the general rule as to the year of reporting income, it is to be construed narrowly. *Pozzi v. Commissioner*, 49 T.C. 119, 127 (1967). See *Corn Products Co. v. Commissioner*, 350 U.S. 46, 51–52 (1955).

Generally, when a buyer extinguishes the seller's debts (i.e., pays and cancels the debts), such extinguishment constitutes a payment in the year of sale for the purposes of section 453(b). *Maddox v. Commissioner*, 69 T.C. 854, 858–859 (1978), and cases there cited (as to the mortgage liability); *Bostedt v. Commissioner*, 70 T.C. 487, 490–491 (1978), and cases there cited (as to the nonmortgage liability). The reason for this rule is that the seller in such situations is in essentially the same position as if the seller had received cash from the buyer and then paid off the debts. The benefit in both situations is the same, and the basic purpose of the statute is served in both situations.

In the instant case, petitioners' obligations—i.e., the mortgage note and the demand note—were extinguished by Newspapers on the date of the closing. Thus, such extinguishment constitutes a payment in the year of sale. Taking this payment into account, petitioners received more than 30 percent of the selling price in the year of sale. Under the law in effect in the year before the Court,[12] so large a payment in the year of sale disqualifies the transaction from installment sale treatment.

This result offends neither the statutory language of the installment sales provision nor the purpose of the provision. Newspapers' discharge of petitioners' obligations constitutes a payment at the time of this discharge, within the meaning of section 453(b)(2)(A)(ii). *Bostedt v. Commissioner, supra.* Petitioners received currently the full benefit of Newspapers' payment of the mortgage note and the promissory note, as surely as if, at the closing, Newspapers had made out its checks to petitioners and petitioners had then endorsed the

---

[12]Petitioners assert as follows: "The rules at issue have been legislatively recognized as being unnecessarily restrictive and have been repealed demonstrating Congressional dissatisfaction with the rules and the pattern of their enforcement by Respondent." Although it is true that the Congress eliminated the 30-percent rule when it revised sec. 453 in sec. 2(a) of the Installment Sales Revision Act of 1980 (Pub. L. 96–471, 94 Stat. 2247), the Congress did not make this relief retroactive to 1976. (See sec. 6(a)(1) of the 1980 Act, 94 Stat. 2256.) We have no authority to apply the 1980 Act amendments with retroactivity that the Congress did not choose to provide. *Bryant v. Commissioner*, 72 T.C. 757, 766 (1979); *Buttke v. Commissioner*, 72 T.C. 677, 680–681 (1979), affd. 625 F.2d 202 (8th Cir. 1980).

checks to the bank. When James, Hess, and Butts returned to the board room, Butts delivered petitioners' notes to petitioners, with both notes stamped "PAID". Thus, before the end of the closing, petitioners had both the cash benefit and the clear knowledge of this benefit.

On the one hand, it is clear from the testimony and the letter of intent that the parties to the sale contemplated that the sale would qualify for installment method treatment and that the downpayment would be "not more than 29% of the total purchase price" (see note 4 *supra*).

On the other hand, the same June 21, 1976, letter of intent stated as follows: "We expect to be able to mortgage the property at 80% of its value, or $216,000, out of which we will pay off the existing indebtedness of $92,000, leaving a net of $124,000." At the closing, on June 30, 1976, Newspapers mortgaged the property for $210,000 and paid off the then-existing indebtedness of $93,166.08, leaving a net of $116,833.92, almost exactly in line with the intent manifested 9 days earlier.

Apparently, the parties to the sale intended a certain result under the tax laws, but they also intended to do—and they in fact did—something that made that result unobtainable as to the real estate (see note 11 *supra*). Unfortunately for petitioners, intent to qualify under section 453 is not controlling in determining whether section 453 applies. See *Yamamoto v. Commissioner*, 73 T.C. 946, 954 (1980), affd. without published opinion 672 F.2d 924 (9th Cir. 1982).

We conclude that Newspapers' payment of petitioners' mortgage note and promissory note constituted a payment received by petitioners in the year of the sale of the real estate.

Petitioners point out that section 1.453–4(c), Income Tax Regs., "provides that in the sale of mortgaged property the amount of any assumed mortgage is included in the total selling price but that 'for the purpose of determining the payments * * * the amount of such mortgage shall be included only to the extent that it exceeds the basis of the property.' Thus, only the excess of any assumed mortgage over seller's basis is payment for purposes of the 30% rule." Since the total of the liabilities relating to the real estate was less than petitioners' basis, it apparently is argued that no part of the

mortgage note and the promissory note should be included in the payments made.

We recognize that this regulation, which has been held to be valid by the Supreme Court, *Burnet v. S & L Bldg. Corp.*, 288 U.S. 406 (1933), provides a limited exception to the general rule in the situations where the seller has a mortgage liability which is assumed or the real property is sold subject to the mortgage liability.

Under both terms (i.e., assumed and taken subject to), "a common element is that the vendor-mortgagor retains his liability, if only secondarily." *Maddox v. Commissioner*, 69 T.C. 854, 858 (1978). In the instant case, both the mortgage note and the promissory note, along with petitioners' liabilities under both notes, were extinguished before the end of the closing, and petitioners knew this (although it may be that neither they nor Dow grasped the tax significance of this fact). In the instant case, despite recitation in the warranty deed that the real estate was conveyed subject to a prior mortgage, Newspapers neither assumed the mortgage note (or the promissory note) nor took the real estate subject to the mortgage note (or the promissory note). Thus, the regulation's predicate (that there be an assumption or taking "subject to") was not satisfied. Accordingly, the regulation does not apply. *Maddox v. Commissioner*, 69 T.C. at 858–859. See *Hunt v. Commissioner*, 80 T.C. 1126 (1983), for a discussion of when and how the regulation is to be applied.

Petitioners rely on *Irwin v. Commissioner*, 390 F.2d 91 (5th Cir. 1968), revg. 45 T.C. 544 (1966); and *United States v. Marshall*, 357 F.2d 294 (9th Cir. 1966), in support of their contention that the regulation applies.

In *Irwin v. Commissioner*, the Court of Appeals stressed that "The cases which involve cancellation of debts of the seller due either to the purchaser or to a third party are to be distinguished from cases involving an assumption by the purchaser of the seller's obligation to a third party." 390 F.2d at 95. The Court of Appeals then concluded that the assumed liabilities, which were paid by the buyers in the ordinary course of the business they bought from the sellers, were to be excluded from the year-of-sale payment category by reason of section 1.453–4(c), Income Tax Regs. 390 F.2d at 96. In the instant case, (1) Newspapers' payments served to cancel petitioners'

debts due to the bank; (2) these payments were not made in the ordinary course of Newspapers' business; (3) by the end of the closing, the liabilities no longer existed, and so there was nothing for Newspapers to assume; and (4) section 1.453–4(c), Income Tax Regs., dealing with assumed mortgages is not applicable. *Irwin v. Commissioner, supra,* is distinguishable.

*United States v. Marshall, supra,* also involved the buyer's assuming current liabilities of the seller's proprietorship, and then the buyer's paying these liabilities in the course of its operation of the newly acquired business. In *Marshall,* the Court of Appeals for the Ninth Circuit also relied on section 1.453–4(c), Income Tax Regs. *United States v. Marshall* is distinguishable for the same reasons as apply to *Irwin v. Commissioner.*

*Decision will be entered for the respondent.*