DELBERT D. EHLERT, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ehlert v. Commissioner
Docket No. 21226-81.
United States Tax Court
T.C. Memo 1985-479; 1985 Tax Ct. Memo LEXIS 149; 50 T.C.M. (CCH) 1048; T.C.M. (RIA) 85479; September 16, 1985. Phillip E. Gibbons, for the petitioner. Patricia Anne Golembiewski, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined a deficiency in petitioner's 1976 Federal income tax in the amount of $22,973. After numerous concessions, the sole issue presented is whether petitioner is entitled to use the installment method of section 453[1] in reporting the gain from his sale of certain real property. The parties articulate the issue as whether the broker's commission in the sale was the seller's obligation and part of the gross purchase price, as respondent contends, or the buyer's separate obligation, as petitioner contends. *150 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioner resided in Days Creek, Oregon at the time he filed his petition in this case. Petitioner timely filed a joint Federal income tax return for 1976 on behalf of himself and his then-wife, Joyce N. Ehlert (Mrs. Ehlert). Subsequently, Mrs. Ehlert filed a separate return for 1976. The parties now agree that the 1976 return filed by petitioner is to be treated as his separate return with head of household filing status. In the fall of 1976, petitioner wanted to sell certain real property, commonly known as the Ehlert Foundry located in Grass Valley, California (the Foundry). He owned the Foundry as his separate property. Petitioner and Richard P. Esterly informally discussed having the W. W. Esterly Organization handle the sale. The record is not clear as to whether they actually discussed in so many words a "net listing" basis under which petitioner would receive a net return of $135,000 and leave it up to the broker to negotiate his commission with the buyer. However, it is clear that petitioner *151 insisted that he had to receive at least $135,000 in the sale and that anything above that would be the broker's fee. There was no written listing agreement. On December 10, 1976, petitioner sold the Foundry to Wood Electric Company (a partnership). The real estate purchase contract shows the purchase price as $150,000 and a commission of $15,000 to the W. W. Esterly Organization. Petitioner (as seller) signed a real estate purchase contract, which had been prepared by Richard P. Esterly, the individual broker involved. At the bottom of that form agreement, below the caption "Acceptance," the purchase contract stated: The undersigned Seller accepts the foregoing offer and agrees to sell the property described thereon the terms and conditions therein set forth. The undersigned Seller has employed W. W. Esterly Organization as Broker(s) and for the Broker(s) services agrees to pay Broker(s) as a commission, the sum of Fifteen Thousand and no/100 Dollars ($15,000.00) payable as follows: (a) On recordation of the deed or other evidence of title, or (b) if completion of sale is prevented by default of Seller, upon Seller's default, or (c) if completion of it is prevented by default *152 of Buyer, only if and when Seller collects the damages from Buyer, by suit or otherwise, and then in an amount not to exceed one half that portion of the damages collected after first deducting title and escrow expenses and the expenses of collection, if any. [Emphasis added.] However, an earlier paragraph of that same form contract provided in handwritten form that: Buyer will deposit in escrow * * * the balance of purchase price as follows: $35,000 cash down of which the above deposit [$500] is a portion thereof. $100,000 note and D/T [deed of trust] to Seller, 8 1/2% int., $1,000/month incl. int., first 2 years, $1,200.00 or more/mo. 3rd yr. to end of term of note--10 year Due date. $15,000.00 note & D/T [deed of trust] to Broker (commission) payable $250/mo. incl. int. at 10% for 1st 2 years, 3rd yr. to end of term of note payments to be $350/mo. * * * [Emphasis added.] The seller's escrow instructions and the escrow closing agreement show the purchase price as $150,000 and the broker's commission as $15,000, paid by the buyer's note and deed of trust. The buyer executed the required $100,000 purchase money note secured by a deed of trust on the *153 Foundry property in petitioner's favor. The buyer also executed a $15,000 installment note secured by a deed of trust on the Foundry property in the broker's favor in payment of his commission. The payments under that $15,000 note were to begin in June of 1977. Esterly had been a licensed broker since 1962 and had been in the real estate business in Grass Valley, California since 1958. Grass Valley is a small town about 50 miles northeast of Sacramento. The contract Esterly prepared for petitioner was a standardized form, well accepted among California real estate practitioners, that had been provided by the California Real Estate Association. Normally, Esterly would modify the standardized form if it did not reflect the actual agreement between the buyer and seller. When dealing with individuals whom he knew and trusted, like petitioner and the buyer's principals in this case, Esterly might not modify the standardized form, relying instead on "the old handshake concept that a man is as good as his word." On his 1976 return, petitioner reported the gain from this real property sale under the installment method.An attachment to petitioner's return, entitled Installment Sales *154 Computation, stated that the gross sales price of the real property was $150,000. This attachment also indicated that petitioner received $35,000 in the year of sale, [2] and treated the $15,000 commission as a mortgage assumed by the buyer. In his statutory notice, respondent determined that petitioner was not entitled to use the installment method because he received more than 30 percent of the selling price in the year of sale. Underlying this determination is respondent's position that the $15,000 commission was petitioner's obligation and that the buyer's "payment" of this commission was part of the payment of the selling price that petitioner received in the year of sale. OPINION The only issue for decision is whether petitioner's sale of his Foundry qualifies for installment sale treatment under section 453. As applicable during the year before the Court, section 453(b) permits such treatment provided *155 "payments" in the year of sale "do not exceed 30 percent of the selling price." [3]Section 453(b)(2)(A)(ii) excludes "evidences of indebtedness of the purchaser" for purposes of the 30-percent limitation. Payments under section 453(b) generally include the buyer's assumption of or cancellation of the seller's liabilities as part of the bargained-for exchange. Bostedt v. Commissioner,70 T.C. 487, 490-492 (1978) and cases cited therein. See also Sallies v. Commissioner,83 T.C. 44, 53-55 (1984). [4] In particular, the buyer's assumption of or cancellation of the seller's obligation to pay a broker's commission is treated as payment to the seller. Bostedt v. Commissioner,supra;Wagegro Corp. v. Commissioner,38 B.T.A. 1225, 1228-1229 (1938). Petitioner does not challenge the holdings in these cases but says that here the obligation to pay *156 the broker's commission was the obligation of the buyer, not the seller. Respondent says the real estate purchase contract clearly shows that the buyer paid the broker's commission in satisfaction of petitioner's obligation, so that petitioner thus received more than 30 percent of the purchase price in the year of sale and hence is not entitled to use the installment method. [5] The real estate purchase contract in this case is not as clear as respondent suggests. We have consistently held that when a taxpayer has executed a written agreement *157 providing the specific terms of a transaction in which the tax consequences are at issue, he must adduce "strong proof" to establish a position at variance with the clear language of his written agreement. Ledoux v. Commissioner,77 T.C. 293, 308 (1981), affd. per curiam 695 F. 2d 1320 (11th Cir. 1983); Porterfield v. Commissioner,73 T.C. 91, 96 (1979); Lucas v. Commissioner,58 T.C. 1022, 1032 (1972). Petitioner, however, is not seeking to vary the terms of his agreement. Although one clause of the real estate purchase contract suggests that petitioner (the seller) had employed the broker and had promised to pay the broker's commission, another clause shows that the buyer was actually undertaking to pay the commission. Moreover, the terms of payment by the buyer are far different from the terms of payment in the clause that indicates petitioner was promising to pay the commission. We think the document is ambiguous on its face. Consequently, the "strong proof" rule does not apply since petitioner is merely offering extrinsic evidence to construe the terms of an ambiguous writing. Peterson Machine Tool Co. v. Commissioner,79 T.C. 72, 81-82 (1982), *158 affd. in an unreported opinion (10th Cir. 1984) (54 AFTR 2d 84-5407, 84-2 USTC P9885); Morrison v. Commissioner,59 T.C. 248, 256 (1972). [6] Cf. Smith v. Commissioner,82 T.C. 705, 713-714 (1984) (the stricter "Danielson" rule [7] is also inapplicable when the agreement is ambiguous). Petitioner bears only the usual burden of proof in this case. Peterson Machine Tool Co. v. Commissioner,supra;Rule 142(a).
*159 While the factual issue in this case is very close, we conclude that payment of the broker's commission was the buyer's obligation and that the buyer did not assume or cancel any obligation of the seller. Both petitioner and Esterly, the individual broker, testified regarding their informal discussion of what amounted to a "net listing" arrangement. Petitioner was insistent that what he wanted was $135,000 and that Esterly could obtain whatever commission he could get from the buyer. Both clearly stated their understanding that Esterly would look to the buyer for his commission. Esterly's failure to modify the standard real estate purchase contract to reflect this agreement is understandable in the context in which this transaction took place--a broker in a small town dealing with long-time business acquaintances whom he knew and trusted. Having received the buyer's note secured by a deed of trust on the Foundry property at the closing, Esterly obviously did not expect to collect a $15,000 commission from petitioner at the closing as suggested by the Acceptance Clause of the form contract. Since the very same form agreement that purported to obligate petitioner to pay the $15,000 *160 broker's commission also provided for a different method and source of payment, we do not think that the purchase contract should be construed as obligating petitioner to pay the commission. We think our conclusion is supported by a comparison of the printed language of the form contract with the language that was handwritten on that form for this specific transaction. Under the specific handwritten terms of the purchase contract, the buyer undertook the obligation to pay the broker's commission. The fact that the printed language of the form contract in the Acceptance Clause designates the "undersigned Seller" [i.e., petitioner] as the one engaging the broker does not persuade the Court that the parties to the agreement intended that petitioner was to be liable for the broker's fee. As far as the buyer was concerned, the $15,000 commission was out of his pocket in any event. Consequently, we think that petitioner's failure to present the testimony of the buyer in this case is of little significance. Since the buyer was as available to respondent as to petitioner, we do not draw any adverse inference from petitioner's alleged failure to call him as a witness, as respondent *161 urges us to do. Although it would undoubtedly have been wiser for petitioner, his buyer, and the broker to clearly memorialize their agreement in writing, their failure to do so is understandable under the circumstances. What happened, in essence, was that non-lawyers tried to use a standardized form to document an agreement that did not quite fit the form. [8] Also Esterly testified that "net listing" arrangements are frowned upon in California real estate practice, and the Court gained the distinct impression from Esterly's testimony that he would not have been particularly eager to place the full terms of their informal agreement into written form. While Esterly's testimony clearly supported petitioner's version of the facts, when pressed for details, he retreated into ambiguous suggestions that he somehow represented both parties to the sale. On the whole, his testimony shows, however, that he did not look to petitioner for payment of his commission. *162 Based on the whole record, we conclude that the $15,000 commission was the buyer's sole and separate obligation and that the buyer was not assuming or cancelling any liability of the seller. Consequently, the buyer's "payment" of the commission [9] is not a payment to petitioner, so petitioner properly reported the gain from his sale of the Foundry under the installment method of section 453. To reflect the above holding and the concessions, *163 Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable year in question and all references to "Rules" are to the Tax Court Rules of Practice and Procedure.↩
2. A little over $6,100 of the cash down payment was disbursed for delinquent taxes and various sales and closing costs, leaving petitioner a net cash payment of about $28,900.↩
3. This 30-percent limitation was repealed by the Installment Sales Revision Act of 1980, Pub. L. 96-471, 94 Stat. 2247, but that change was not retroactive to the year 1976.↩
4. The buyer's assumption of or purchase subject to the seller's mortgage indebtedness is not treated as payment in applying the 30-percent rule except to the extent the indebtedness exceeds the seller's basis. Sec. 1.453-4(c), Income Tax Regs. See generally, Sallies v. Commissioner,83 T.C. 44 (1984); Hunt v. Commissioner,80 T.C. 1126↩ (1983). 5. Petitioner's $35,000 cash down payment plus the $15,000 commission equals $50,000, 33-1/3 percent of the stated $150,000 purchase price.↩
6. We note that the Ninth Circuit Court of Appeals, to which an appeal would lie in this case, was an early advocate of the strong proof rule. Schulz v. Commissioner,294 F. 2d 52, 55 (9th Cir. 1961), affg. 34 T.C. 235 (1960). And although the Ninth Circuit has indicated that it might apply a stricter standard akin to the "Danielson" rule (see n. 7, infra), that respondent has always favored, see Palo Alto Town & Country Village, Inc. v. Commissioner,565 F. 2d 1388, 1390 (1977); Baxter v. Commissioner,433 F. 2d 757, 759 (1970); Rogers v. United States,290 F. 2d 501 (1961), that court has not expressly addressed the question. See Throndson v. Commissioner,457 F. 2d 1022, 1025 (1972), affg. 51 T.C. 306↩ (1968). In light of our preference for the strong proof rule, we have continued to apply it in cases like the instant one appealable to the Ninth Circuit. In any event, we think the result in this case will be the same under either rule. 7. The "Danielson" rule holds that "a party can challenge the tax consequences of his agreement as construed by the Commissioner only by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc." Commissioner v. Danielson,378 F. 2d 771, 775 (3d Cir. 1967), vacating and remanding 44 T.C. 549 (1965), cert. denied 389 U.S. 858 (1967). See also Spector v. Commissioner,641 F. 2d 376 (5th Cir. 1981), revg. 71 T.C. 1017↩ (1969).
8. We think that the printed escrow form and petitioner's subsequent reporting, showing a purchase price of $150,000 instead of petitioner's net price of $135,000, again are attributable to the parties' effort to make these other documents conform to the standard form real estate purchase contract.↩
9. Here, the broker did not receive any cash the year of the sale; he received a note from the purchaser with the first payment of $250 due on that note in June of 1977. If petitioner himself had received such a note from the buyer, it clearly would not constitute a "payment" in the year of sale. Section 453(b)(2)(A)(ii) excludes "evidences of indebtedness of the purchaser" for purposes of the 30-percent limitation. See also Sec. 1.453-1(c)(1) and Sec. 4.453-3, Income Tax Regs. The note was neither payable on demand nor readily tradable ( sec. 1.453-3, Income Tax Regs.) and would not have constituted payment in the seller's hands.Cf. Porterfield v. Commissioner,73 T.C. 91 (1979). See also Kenroy, Inc. v. Commissioner,T.C. Memo. 1984-232 (notes payable in specified installments, not on demand, and not readily tradable are not payments despite the fact that notes were guaranteed). In Bostedt v. Commissioner,70 T.C. 487 (1978), unlike the present case, it was undisputed that the seller, not the buyer, was liable for the broker's commission, and the Court in Bostedt did not discuss the matter of "evidences of indebtedness of the purchaser." Here petitioner has resolutely resisted any suggestion that he was ever liable for the broker's commission, and again the Court does not consider whether the giving of the purchaser's evidence of indebtedness (a note payable on the installment plan) serves to discharge a seller's liability or merely constitutes security for, but not an assumption or cancellation of, that liability. Cf. Kenroy, Inc. v. Commissioner,supra;Sprague v. Commissioner,627 F. 2d 1044↩ (10th Cir. 1980).