DAVID ROSEN AND VERA ROSEN, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 7179–71.   Filed April 8, 1974.

*Jerome Kaplan*, for the petitioners.
*Alan E. Cobb*, for the respondent.

QUEALY, *Judge:* The respondent determined deficiencies in the Federal income tax of the petitioners for the taxable years 1965 and 1967 in the amounts of $3,481.33 and $87,010.81, respectively.

The principal issue for our determination is whether petitioner, David Rosen, realized gain under section 357(c)[1] in the taxable year 1967, on the transfer of all the assets and liabilities of his sole proprietorship to a corporation, in which he owned 100 percent of the outstanding stock, to the extent that the liabilities assumed exceeded his adjusted basis in the assets transferred.

The resolution of such issue will determine whether and to what extent petitioners have a net operating loss for 1967 which they would be entitled to carry back as a deduction to the taxable year 1965.

### FINDINGS OF FACT

Petitioners are David and Vera Rosen, husband and wife, whose place of residence at all times pertinent herein was Philadelphia, Pa. Petitioners filed their joint Federal income tax returns for the taxable years 1965 and 1967 with the district director of internal revenue, Philadelphia, Pa. Vera Rosen is a party to this action only by virtue of having filed a joint return with her husband. Accordingly, further references to "petitioner" will refer only to David Rosen.

---

[1] All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

Petitioner was engaged in the leasing and selling of coinbox equipment and phonograph records. The major portion of his business was conducted through his wholly owned corporation, David Rosen, Inc., although he did have numerous other business entities carrying on related aspects of the business.

On May 14, 1965, David Rosen (hereinafter referred to as petitioner) entered into a distributorship agreement with Societa' Internazionale Fonovisione, S.p.A. (hereinafter referred to as SIF), a corporation organized and existing under the laws of the Republic of Italy. Under the distributorship agreement, petitioner received the exclusive right to distribute motion picture jukeboxes bearing the name "cinebox" and "cinejukebox" in the United States of America, its territories and possessions. Cinebox is a coin-operated machine equipped with a selector device which permits the seeing and hearing of preselected motion pictures. Cinejukebox possesses the same qualities of a cinebox except it provides an additional jukebox feature which permits a customer to choose between a motion picture or phonograph record. At the time the agreement was entered into, the cinejukebox was still in the development stages.

The agreement provided that petitioner had the right to assign the distributorship to a domestic U.S. corporation in which he owned 51 percent or more of the outstanding voting stock and which possessed a net worth of at least $100,000. If exercised, however, he would be precluded, without the written consent of SIF, from divesting himself of the minimum required control any time before May 31, 1967. In the event the assignee corporations agreed to assume liability for petitioner's obligations under the agreement, he would be released of any further liability thereunder.

The initial term of the agreement was from May 14, 1965, to May 31, 1967, automatically renewable for successive periods of 1 year for 10 consecutive years.

At the outset, petitioner operated his exclusive distributorship in the form of a sole proprietorship under the trade name Cinebox U.S.A. (hereinafter referred to as Cinebox). He elected to report the income and losses of the business on the accrual method of accounting. Its business consisted of leasing cineboxes and selling the films and parts which went with the machines.

The initial promotional effort by Cinebox involved the leasing of 60 cineboxes on a 25-week trial basis to distributors throughout the country. Although the machines were favorably received, there were numerous complaints about the inadequate selection and supply of films used in the machines. The results may be summarized as follows:

| | Year ended 12/31/66 | 6 months 6/30/67 | Totals |
|---|---|---|---|
| Receipts | $43,900 | $7,400 | $51,300 |
| Less: | | | |
| Expenses | 113,500 | 100,700 | 214,200 |
| Depreciation | 157,700 | 30,100 | 187,800 |
| Net loss | 227,300 | 123,400 | 350,700 |

The losses thus sustained were reflected in the individual income tax returns filed by petitioner for the years 1966 and 1967. The funds needed to meet the deficit in cash flow from such operations were provided by petitioner directly or by way of withdrawals from his wholly owned corporation, David Rosen, Inc.

Petitioner would deposit funds with David Rosen, Inc., earmarked for the cinebox operations in addition to permitting the amounts owed him by David Rosen, Inc., to accumulate in the "officer's account" on the books of the corporation. Whatever advances were made by David Rosen, Inc., to satisfy the current operating expenses of the cinebox operations were repaid from these two sources.

With the successful development and testing of the new cinejukebox in early 1967, petitioner decided to transfer the cinebox operations to a corporation with the expectation that new financing from outside sources might be more readily available to cover the cost of purchasing and distributing the cinejukebox on a widespread commercial basis.

On July 1, 1967, petitioner transferred all the assets and liabilities of Cinebox to Filmotheque Discotheque, Inc. (hereinafter referred to as Filmotheque), a Pennsylvania corporation formed by him in June of 1966 and in which he held 100-percent control. Until the time the transfer occurred, Filmotheque had remained an inactive shell, having a capitalization of $1,000 from the issue of 1,000 shares at $1 each. As of June 30, 1967, the assets and liabilities of the cinebox business, which were taken over by Filmotheque, consisted of the following:

| *Assets* | | |
|---|---|---|
| Cash | | $57.94 |
| Inventory: | | |
| Cineboxes | $259,415.75 | |
| Less: Depreciation | 187,809.56 | 71,606.19 |
| Film | | 41,470.28 |
| Prepaid finance charges | | 31,409.74 |
| Prepaid expenses | | 217.43 |
| Total assets | | 144,761.58 |

*Liabilities and net worth*

Accounts payable:

| | | |
|---|---:|---:|
| David Rosen, Inc | $33,727.33 | |
| Escrow leasing | 57,566.86 | $91,294.19 |

Notes payable—current:

| | | |
|---|---:|---:|
| Continental Bank & Trust Co | 55,000.00 | |
| Lincoln National Bank | 2,500.00 | |
| Lincoln National Bank | 42,315.74 | |
| Globe Consumer Discount Co | 13,520.00 | 113,335.74 |

Notes payable—long term:

| | | |
|---|---:|---:|
| Lincoln National Bank | 54,166.90 | |
| Globe Consumer Discount Co | 33,280.00 | 87,446.90 |

| | |
|---|---:|
| Loans payable—David Rosen | 159,957.54 |
| Total liabilities | 452,034.37 |
| Investment | 40,000.00 |
| Net loss | (347,272.79) |
| Total net worth | (307,272.79) |
| Total liabilities and net worth | 144,761.58 |

The adjusted basis of the above assets and liabilities in the hands of petitioner at the time of the transfer are identical to the balance sheet figures shown above.

With respect to the balance sheet entry of $159,957.54 shown as owing to petitioner individually, respondent concedes that such amount should not be considered a liability for purposes of the present inquiry since it merely represents capital contributions by petitioner to offset the prior operating losses of the business. As to the remaining obligations listed above, petitioner was and remained personally liable thereon for the full amount.

Filmotheque never maintained its own set of books and records. Instead, both before and after the transfer, operations of the cinebox business were recorded on an accounts receivable ledger card of David Rosen, Inc., which reflected both the receipt of revenues and the payment of expenses. The actual title on the ledger card itself was not changed from Cinebox to Filmotheque until the middle of November.

The inventory of machines was stored in a warehouse of David Rosen, Inc., where it has remained ever since. None of the inventory has been either sold or leased.

In November of 1967, 40 cinejukeboxes were purchased by Filmotheque at a cost of $76,200, financed with a loan of $100,000 from

Philadelphia National Bank. The loan was guaranteed by petitioner personally. In giving the loan, a bank official testified that it had no financial data on Filmotheque whatsoever. The cinejukeboxes have remained in a bonded warehouse as a consequence of failing to pay the import duties thereon.

The revenue and operating expenses of Filmotheque as reflected in summary form on its corporate income tax return filed for the taxable period ended December 31, 1967, consisted of the following:

Income:

| | | |
|---|---:|---:|
| Rental income | $2, 771. 13 | |
| Sales—parts | 28. 68 | |
| Sales—film | 523. 53 | $3, 323. 34 |

Operating expenses:

| | | |
|---|---:|---:|
| Advertising | 1, 773. 47 | |
| Auto and travel expense | 3, 277. 28 | |
| Freight | 1, 094. 90 | |
| Incorporation expense | 150. 00 | |
| Insurance | 1, 683. 43 | |
| Interest | 18, 396. 53 | |
| Office expense | 422. 26 | |
| Parts | 721. 04 | |
| Payroll | 6, 314. 95 | |
| Service expense | 399. 60 | |
| Show and convention expense | 5, 126. 92 | 39, 360. 38 |
| Net loss | | (36, 037. 04) |

The assets and liabilities of Filmotheque as reflected in summary form on its corporate income tax return for the taxable period ended December 31, 1967, consisted of the following:

*Assets*

| | | |
|---|---:|---:|
| Cash | | $4, 498. 06 |
| Inventory: Equipment | $156, 861. 19 | |
| Film | 41, 470. 28 | 198, 331. 47 |
| Prepaid insurance | | 1, 603. 00 |
| Goodwill | | 350, 740. 20 |
| Incorporation expense | | 600. 00 |
| Total assets | | 555, 772. 73 |

*Liabilities and equity*

Accounts payable:

| | | |
|---|---:|---:|
| David Rosen, Inc | 48, 888. 21 | |
| Escrow Leasing Corp | 85, 995. 20 | 134, 883. 41 |

*Liabilities and equity*—Continued

Notes payable—current:

| | | |
|---|---:|---:|
| Continental Bank & Trust Co | $27, 500. 00 | |
| Philadelphia National Bank | 100, 000. 00 | |
| Bank of Old York Road | 20, 927. 69 | |
| Lincoln National Bank | 5, 477. 58 | |
| Lincoln National Bank | 20, 000. 00 | |
| Globe Consumer Discount Co | 10, 520. 00 | $184, 425. 27 |

Notes payable—long term:

| | | |
|---|---:|---:|
| Bank of Old York Road | 20, 927. 69 | |
| Lincoln National Bank | 33, 167. 86 | |
| Globe Consumer Discount Co | 18, 448. 00 | |
| Belle Weinberg | 40, 000. 00 | 112, 543. 55 |

| | |
|---|---:|
| Loans payable—David Rosen | 59, 957. 54 |
| Total liabilities | 491, 809. 77 |
| Capital stock | 100, 000. 00 |
| Retained earnings—for period to 12/31/67 | (36, 037. 04) |
| Total net worth | 63, 962. 96 |
| Total liabilities and net worth | 555, 772. 73 |

The notes payable and loans payable to those other than the petitioner represented funds obtained either in the name of the petitioner or on the personal guarantee of the petitioner.

The capital stock account of Filmotheque at the beginning of the year was $1,000. As mentioned earlier, petitioner personally paid off a debt of $159,957.54 owing to David Rosen, Inc., just prior to the transfer of the business to Filmotheque. The increase in the capital account to $100,000 reflects a capitalization of part of such payment. This was done in an effort to comply with a provision in the distributorship agreement with SIF which required any transferee corporation of Cinebox have a minimum capitalization of $100,000. The remaining part of the payment is reflected on the books as a debt due petitioner personally. The respondent considers the full amount of the payment as a capital contribution. The "goodwill" of $350,740.20 represents an arbitrary amount required to enable Filmotheque to show a capital of $100,000. There was, in fact, no goodwill within the meaning of the internal revenue laws. (See Rev. Rul. 68–609, 1968–2 C.B. 327).

As of December 31, 1967, no cinejukeboxes had been sold or were under lease. A few cineboxes were still outstanding from the initial promotional effort. Filmotheque ceased taking depreciation on the cineboxes after the transfer from Cinebox since the business emphasis had shifted from leasing to selling.

The primary consideration which petitioner had in mind when the cinebox business was transferred to Filmotheque was to obtain outside financing. This, it was hoped, would provide the capital needed to market the cinebox and cinejukebox commercially and thereby enable Filmotheque to pay the liabilities incurred by petitioner personally while operating the business as a sole proprietorship. The possible conversion of some cineboxes to cinejukeboxes was considered.

Petitioner discussed a private placement of some $250,000 with Drexel, Harriman & Ripley, $100,000 being for the machines and $150,000 for the introduction expenses. Price Waterhouse & Co. was commissioned to assemble information with respect to Filmotheque's present and past operations, including those of the petitioner, and its prospects for the future. Upon examining the report of Price Waterhouse & Co., which was completed in January of 1968, Drexel, Harriman & Ripley withdrew its proposal. No other private placement ever materialized. The petitioner ultimately was forced to pay or to refinance the indebtedness initially transferred to Filmotheque as well as subsequent borrowings by Filmotheque.

On his income tax return for 1967, petitioner omitted any reference to the transfer in issue, treating the entire transaction as nontaxable. It was his position that there was no assumption of liabilities by Filmotheque since he was never released from liability thereon and the creditors continued to look to him for payment. Alternatively, he considered the entire transfer as illusory. Respondent asserted a deficiency against petitioner for 1967 in the amount of $87,010.81 on the grounds that the transfer resulted in a taxable gain of $250,740.20 under section 357(c), such amount representing the excess of liabilities assumed over the adjusted basis of the assets transferred.

Respondent now concedes that the liabilities exceed the assets by only $147,315.25, partly as a result of having incorrectly included in its initial determination a liability owing from the cinebox business to petitioner. The respondent acknowledges such amount should have been properly treated as a capital contribution by petitioner to the cinebox operations to absorb its operating losses.

Respondent also asserted a deficiency in the amount of $3,481.33 against petitioner for the taxable year 1965 on account of the carryback to the year 1965 of the net operating loss shown on petitioner's return for the year 1967.

### OPINION

The petitioner was engaged both individually, and through David Rosen, Inc., his wholly owned corporation, in the business of distributing and leasing coin-operated record players, commonly known as

jukeboxes. In 1966, petitioner sought to expand that business to incorporate a machine which provided visual entertainment under the trade name of "cinebox." Petitioner obtained the exclusive distributorship for the cinebox from SIF, the Italian manufacturer. He additionally acquired the rights to distribute the "cinejukebox" which, although in the development stages, was expected to offer an option of either visual or sound entertainment.

At the outset, the cinebox was offered by the petitioner for lease on a basis similar to the record players being leased. Such operations were conducted by the petitioner as a proprietorship. As of June 30, 1967, petitioner had sustained losses amounting to $350,700, of which $187,800 represented depreciation. As a result, the petitioner had incurred indebtedness of $292,076.83, including $33,727.33 due to David Rosen, Inc. The petitioner had also advanced a total of $159,957.54 of his personal funds.

As of June 30, 1967, petitioner transferred the cinebox business to Filmotheque, a corporation which had previously been organized but had not transacted any business. As of that date, the liabilities of the cinebox business, including the sum of $159,957.54 due to the petitioner, amounted to $452,034.37. The assets per books amounted to $144,761.58 leaving a deficit of $307,272.79. Filmotheque was clearly insolvent. However, the petitioner remained liable on the obligations assumed by Filmotheque. At the same time, in order to meet the requirement that the distributorship have a capitalization of $100,000, the petitioner transferred $100,000, of the total of $159,957.54 shown as an indebtedness due petitioner, to the capital stock account and set up an asset as "goodwill" of $350,740.20.

At the outset, petitioner argues that the transfer of the cinebox business to Filmotheque should be disregarded as "illusory." The transfer was reflected primarily—if not solely—on the records of David Rosen, Inc. However, the petitioner treated Filmotheque as a viable corporation, filing its corporate income tax return for the taxable period ending December 31, 1967, purchasing additional cinejukeboxes in the name of the corporation, crediting the receipts and disbursements of the cinebox business to the corporation, and seeking outside financing in the name of the corporation. Under such circumstances, the existence of a corporate entity for tax purposes was more than just "illusory." Cf. *David F. Bolger*, 59 T.C. 760 (1973).

As a result of the foregoing transactions, the petitioner is deemed to have transferred to Filmotheque assets having a basis of $144,761.58 subject to liabilities, payable other than to the petitioner, in the amount of $292,076.83. To the extent that such liabilities exceeded the peti-

tioner's basis for the assets transferred, the respondent has determined that the petitioner realized a gain under section 357(c)(1).[2]

It must be conceded that the transaction comes within the specific language of the statute. The transfer of the cinebox business to Filmotheque was an exchange within the provisions of section 351. When the petitioner transferred the cinebox business to Filmotheque, the sum of the liabilities assumed, or to which the property might be subject, exceeded the basis of the assets transferred to the extent of $147,315.25. While the petitioner nevertheless remained personally liable for the payment of such liabilities, and the creditors never looked to Filmotheque for payment, there is no requirement in section 357 (c)(1) that the transferor be relieved of liability.

As the courts have sometimes remarked, section 357(c)(1) may produce a harsh result. *Peter Raich*, 46 T.C. 604 (1966); *Wilford E. Thatcher*, 61 T.C. 28 (1973). For that reason, wherever possible, the courts have sought to limit its application. E.g., *Bongiovanni* v. *Commissioner*, 470 F. 2d 921 (C.A. 2, 1972), reversing a Memorandum Opinion of this Court. Section 357(c)(1) may even result in the realization of a gain for tax purposes where none in fact exists. However, the petitioner did not contend, and the Court is loath to find, that the result exceeds the constitutional powers to tax vested in the Congress.[3]

Having determined that the petitioner realized a gain in the amount of $147,315.25 on account of the transfer of the cinebox business to Filmotheque, it becomes necessary to determine the character of such gain. The nature of the gain realized under section 357(c)(1) is determined by allocating such gain among the assets transferred on the basis of their fair market value. Sec. 1.357–2, Income Tax Regs.; *Peter Raich, supra.*

No basis has been presented for the allocation of the gain to the various assets transferred. With respect to cash, the film inventory, and prepaid charges, it cannot be said that the fair market value

---

[2] Sec. 357(c)(1) provides:

SEC. 357. ASSUMPTION OF LIABILITY.

  (c) LIABILITIES IN EXCESS OF BASIS.—

    (1) IN GENERAL.—In the case of an exchange—

      (A) to which section 351 applies, or

      (B) to which section 361 applies by reason of a plan of reorganization within the meaning of section 368(a)(1)(D),

if the sum of the amount of the liabilities assumed, plus the amount of the liabilities to which the property is subject, exceeds the total of the adjusted basis of the property transferred pursuant to such exchange, then such excess shall be considered as a gain from the sale or exchange of a capital asset or of property which is not a capital asset, as the case may be.

[3] In enacting this provision, the Congress intended to deal with the case where the transferor takes the deduction for depreciation on account of assets purchased with borrowed funds and the transferee repays the loan. Its effect is analogous to other recapture provisions in the Code. S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess., p. 270 (1954) ; H. Rept. No. 1337, to accompany H.R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess., p. A129 (1954).

exceeded book value. On the other hand, Filmotheque made additional purchases of cinejukeboxes after the transaction. It is only logical, in the light of that fact, to allocate the entire gain to the inventory of cineboxes, on account of which depreciation of $187,809.56 had been claimed notwithstanding their limited use.

In the hands of the petitioner, the cineboxes represented section 1245 property as defined in section 1245(a)(3). Accordingly, it is unnecessary to determine whether, as the respondent contends, the gain would be taxable as ordinary income under section 1239. If section 1239 does not apply, the gain would nevertheless be taxable as ordinary income under section 1245(a)(1).[4] The difference between the recomputed basis and the adjusted basis of the cineboxes exceeds the amount of the gain. The petitioner has failed to show that the fair market value of his cineboxes is any less than the recomputed basis determined under section 1245(a)(2). Applying hindsight, the cineboxes might have been considered to be worthless. However, as of January 31, 1968, the date of the report of Price Waterhouse & Co., the petitioner still had plans for the leasing of the cineboxes, or the conversion thereof to cinejukeboxes. He had also ordered additional cinejukeboxes.

Since we have determined that the petitioner has realized ordinary income in the amount of $147,315.25 under section 357(c)(1), such gain negates the net operating loss reported by petitioners on their 1967 return. Therefore, there can be no carryback of such loss to the taxable year 1965 as claimed. Respondent's determination on this issue is also sustained.

*Decision will be entered under Rule 155.*

---

[4] Sec. 1245(a)(1) provides:

SEC. 1245. GAIN FROM DISPOSITIONS OF CERTAIN DEPRECIABLE PROPERTY.

  (a) GENERAL RULE.—

    (1) ORDINARY INCOME.—Except as otherwise provided in this section, if section 1245 property is disposed of during a taxable year beginning after December 31, 1962, the amount by which the lower of—

      (A) the recomputed basis of the property, or

      (B) (i) in the case of a sale, exchange, or involuntary conversion, the amount realized, or

        (ii) in the case of any other disposition, the fair market value of such property, exceeds the adjusted basis of such property shall be treated as gain from the sale or exchange of property which is neither a capital asset nor property described in section 1231. Such gain shall be recognized notwithstanding any other provision of this subtitle.