WILLIAM F. OWEN, JR., AND GRETCHEN K. OWEN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; STEPHEN B. McEACHRON AND MARY JANE McEACHRON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Owen v. Commissioner
Docket Nos. 26790-84; 26791-84.
United States Tax Court
T.C. Memo 1987-375; 1987 Tax Ct. Memo LEXIS 375; 53 T.C.M. (CCH) 1480; T.C.M. (RIA) 87375; July 28, 1987
John S. Jagiela and Mark A. Kimball, for the petitioners. Genelle Forsberg, for the respondent. GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: Respondent determined deficiencies in Federal income taxes in these consolidated cases [1] as follows: Docket Nos.
1972 [2]
1980
1981
26790-84
$ 563.32
$ 33,810.12
$ 57,913.92
26791-84
$ 797.00
$ 33,900.26
$ 52,330.01
After concessions, the issues for our consideration are whether petitioners are entitled to investment tax credits under section 46(e)(3)(B) [3] in 1980 and *377 1981, and whether they must recognize gain under section 357(c), concerning a 1981 equipment transfer, pursuant to section 351. FINDINGS OF FACT The parties have stipulated some of the facts and their stipulation of facts and attached exhibits are incorporated herein by this reference. William F. and Gretchen K. Owen, husband and wife at all times relevant to this case, resided in Los Angeles, California, at the time their petition was filed. They timely filed joint Federal income tax returns for the years 1980 and 1981. Stephen B. and Mary Jane McEachron, husband and wife at all times relevant to this case, resided in Long Lake, Minnesota, at the time their petition was filed. They timely filed joint Federal income tax returns for the years 1980 and 1981. [4] For convenience, we sometimes refer to petitioner, William F. Owen, *378 as "Owen," and to petitioner, Stephen B. McEachron, as "McEachron;" and collectively, we sometimes refer to Owen and McEachron as petitioners. Owen and McEachron have been involved in several business ventures. In 1977, they organized McO Investment (McO) as a general partnership, of which they each held a 50-percent interest. McO's principal business was investing in real estate ventures. Sometime around 1980, petitioners decided to enter the seismic drilling operation business. [5] Petitioners first attempted to purchase an ongoing concern and eventually decided to start their own seismic drilling business. Petitioners consulted Nick Hay (Hay), a tax specialist, seeking advice on how to structure the business. Petitioners structured the seismic drilling business by placing the equipment in McO and causing Western Exploration, Inc. (Western), to conduct operations. Western (which was owned equally by petitioners) was organized January 1, 1980, under the laws of Minnesota, and during 1980 and 1981, was a Subchapter C corporation. [6] Petitioners chose to have McO own the equipment and Western *379 conduct the operations because (1) petitioners would be entitled to the investment tax credit and the depreciation associated therewith, and (2) the corporation would provide some measure of insulation in case of a catastrophe. Pursuant to this arrangement, McO and Western entered into several lease agreements. Generally, the leases were either on a month-to-month basis, or for indefinite terms, and provided that either party could cancel by giving advance notice. [7] McO financed the purchase of the equipment [8] largely by obtaining loans from Wayzata Bank and Trust Co. (Wayzata Bank). [9] In some of the loan proposals, petitioners presented McO's and Western's consolidated income and cash-flow statements to Wayzata Bank. *380 In addition to the equipment, in which Wayzata Bank had a security interest [10] in connection with a loan agreement dated May 26, 1981, [11] petitioners pledged a $ 100,000 certificate of deposit as additional collateral on the indebtedness. [12] Petitioners, in connection with the same loan agreement, personally guaranteed the entire indebtedness. *381 The oil boom of the late 1970's began faltering around 1981 and petitioners experienced problems servicing their debt. At about the same time, the equipment began to decline in value. In order to abate the potential for substantial McO losses, petitioners decided to sell their seismic drilling business. Sometime around November or December 1981, petitioners met with Hay to discuss disposition of the business. Petitioners decided that transferring McO's assets to Western and then selling the business as a single entity offered the most attractive way to dispose of the business. Petitioners realized, however, that McO's outstanding indebtedness exceeded McO's adjusted basis in the property. In order to avoid a potential Federal income tax problem, petitioners met with bank officials and discussed the possibility of the bank reducing its security interest in the equipment. On December 31, 1981, petitioners transferred substantially all of the equipment to Western. There was no contemporaneously written documentation regarding this transfer. A "Third Party Pledge Agreement," dated December 30, 1981, between Western and Wayzata Bank, apparently granted the latter a security *382 interest in the equipment transferred. [13]
At the time of transfer, the aggregate unpaid principal balance on the consolidated loans payable to Wayzata Bank was $ 988,008.48. McO's books reflected an adjusted basis in the equipment of $ 781,862.23. In his notice of deficiency, respondent determined an adjusted basis in the equipment of $ 763,354.23. Respondent began his examination in April 1982. On or about June 24, 1982, the Internal Revenue agent conducting the audit requested documentation regarding the December 31, 1981, transfer. During June or July 1982, a "Transfer agreement" purportedly governing the equipment transferred on December 31, 1981, was drafted. That agreement reflected that "as of this 31st day of December, 1981," Western agreed to pay and assume *383 $ 781,862.23 of the indebtedness incurred by McO to purchase the equipment. Western also agreed to indemnify McO against claims arising out of the agreement, the equipment or use of the equipment. An "Agreement" between McO and Western, also drafted in June or July 1982, purportedly modified the Transfer agreement. This modifying agreement also reflected that it was "as of this 31st day of December, 1981." It further noted that the equipment transferred was "security for certain purchase money indebtedness in an amount in excess of the indebtedness assumed by Western" and that Western would not "assume any of said indebtedness in excess of $ 781,862.23, it being expressly agreed by and between the parties that any said indebtedness in excess of the amount assumed by Western, shall be the sole obligation of McO." The Internal Revenue agent received the Transfer agreement and modification on July 14, 1982. The Transfer agreement and the agreement modifying it were executed, apparently, around September 1982. On September 3, 1982, Wayzata Bank released part of its security interest in the equipment. The total outstanding indebtedness to Western was restructured to provide that *384 Owen and McEachron individually assumed personal liability for a portion of the indebtedness. On September 2, 1982, McEachron had reached an agreement to sell his 50-percent interest in Western to Mountain States Seismic Service, Inc., an unrelated party. This agreement appears to have been made with the condition that McEachron's portion of the indebtedness be reduced the estimated value of the equipment ($ 750,000). OPINION The first issue for our consideration is whether petitioners are entitled to an investment tax credit. The sole dispute concerning this issue is whether petitioners satisfy section 46(e)(3)(B). Section 38 allows a credit against tax for investments in certain depreciable property in an amount determined under section 46. In pertinent part, section 46(e)(3) provides: (e) Limitations with Respect to Certain Persons. -- * * * (3) Noncorporate lessors. -- A credit shall be allowed by section 38 to a person which is not a corporation with respect to property of which such person is the lessor only if- * * * (B) the term of the lease (taking into account options to renew) is less than 50 percent of the useful life of the property. * * *
Petitioners *385 bear the burden of proving that the lease were for less than 50 percent of the useful lives of the properties. Welch v. Helvering,290 U.S. 111 (1930); Rule 142(a).[14]
In determining whether the lease is of an indefinite duration for purposes of section 46(e)(3)(B), all pertinent facts and circumstances should be considered. Highland Hills Swimming Club, Inc. v. Wiseman,272 F.2d 176 (10th Cir. 1959); Buddy Schoellkoph Products, Inc. v. Commissioner,65 T.C. 640, 656 (1975). The length of a lease term is determined by the "realistic contemplation" of the parties at the time the lease was entered into. Hokanson v. Commissioner,730 F.2d 1245, 1248 (9th Cir. 1984), affg. a Memorandum Opinion of this Court. If there is reasonable certainty that the lessee will continue leasing the property beyond the period stated in the lease, the lease term is considered indefinite. G. W. Van Keppel Co. v. Commissioner,295 F.2d 767, 770-771 (8th Cir. 1961), affg. *386 a Memorandum Opinion of this Court. The actual duration of the lease is not necessarily determinative. Ridder v. Commissioner,76 T.C. 867, 875 (1981); Bloomberg v. Commissioner,74 T.C. 1368, 1371 (1980). Petitioners contend that they intended to (and in fact did) lease equipment to third parties and, in any event, that they were advised that they must terminate the leases prior to the expiration of 50 percent of the useful life of the equipment, and accordingly planned to (and actually did) transfer the equipment before such time. Respondent maintains, that from the inception of the leases, petitioners did not "realistically contemplate" leasing the equipment to third parties, and accordingly, are not entitled to the investment tax credit. Respondent also contends that the transfers were not before the expiration of 50 percent of the useful life of the equipment, and that in any event, actual transfer is not determinative. This issue is a factual matter, and based on the entire record, we agree with respondent. Upon deciding that they would enter the seismic drilling market, petitioners consulted with professional advisors about the best *387 way to structure the contemplated business. They decided to form a corporation in which the business operations would lie, and to purchase the equipment used in the operation through a pre-existing partnership. This would accomplish the dual purpose of insulating petitioners from personal liability in the event of a catastrophe and enable them to benefit individual through depreciation deductions and the investment tax credit. Apparently, McO only purchased equipment specifically tailored to Western's anticipated needs. Petitioners obtained loans from Wayzata Bank to finance such purchases; petitioners gave the bank a security interest in the equipment and later also personally guaranteed the loans. In obtaining some of the loans, petitioners presented Wayzata Bank with loan proposals containing consolidated statements of income and loss for McO and Western. McO and Western entered into several leases involving the equipment. The leases were either month-to-month or for indefinite periods. Either party could cancel a lease upon proper notice. Most of the loan documentation with Wayzata Bank reflected total revenues equal to revenues expected from the equipment rental to *388 Western. There is nothing in the record that indicates that Western contemplated renting equipment from anyone but McO and that petitioners intended to lease the equipment to anyone other than Western, so long as Western could use the equipment. Petitioners testified that they intended to and did lease the equipment to lessees other than Western. [15] We find, however, that the circumstances surrounding the equipment acquisition are more indicative of petitioners' intent than their self-serving testimony. Cf. Siegel v. Commissioner,78 T.C. 659, 699 (1982). Petitioners also argue that the equipment was actually transferred; that some transfers were before the expiration of 50 percent of the assets useful life, [16] and as such that they should be allowed the investment tax credit. [17] Even assuming that *389 petitioners' contention was correct (i.e., that a party who planned to transfer equipment prior to the exploration of 50 percent of its useful life and actually did, would not be denied an investment tax credit under section 46(e)(3)(B) the equipment transfer in this case was a sale to an entity wholly owned by petitioners, which resulted from an unforeseeable event. [18]
*390 Finally, petitioners contend that they considered the issue at hand in structuring the transaction; sought to avoid any adverse tax problems; and as such should be allowed the claimed benefit. Again, we must disagree. We would expect petitioners, as sophisticated businessmen, to seek to minimize tax consequences and maximize the economic benefits of business ventures. Acknowledgment of a tax problem and appropriate action to avoid or cure the problem are not one in the same. Under the circumstances of this case, we conclude that the leases were for indefinite time periods. The only other issue for our consideration is whether petitioners must realize gain on the transfer of assets from McO to Western. Section 351(a) generally provides that no gain or loss shall be recognized where property is transferred to a corporation. The assumption of a liability will not disqualify the transaction from section 351 treatment. Section 357(c)(1), however, requires recognition of gain to the extent that "the sum of the amount of the liabilities assumed, plus the amount of the liabilities to which the property is subject, exceeds the total of the adjusted basis of the property transferred. *391 " So long as the transferred property is subject to the debt, it will constitute a section 357(c) liability, regardless of whether petitioners were personally liable on the debt. See Smith v. Commissioner,84 T.C. 889 (1985), affd. per order 805 F.2d 1073 (D.C. Cir. 1986), citing Rosen v. Commissioner,62 T.C. 11, 19 (1974), affd. without published opinion 515 F.2d 507 (3d Cir. 1975); Lessinger v. Commissioner,85 T.C. 824, 837 (1985), on appeal (2d Cir., March 29, 1987). Petitioners contend that, at the time of transfer, they had an oral agreement with Wayzata Bank releasing any security interest in the transferred equipment which exceeded such equipment's adjusted tax basis, and that such agreement was reduced to written form nine months after the transfer was completed. Petitioners argue that this position is supported by (1) their books and records, and (2) the fact that they were conscious of a potential section 357(c) problem prior to the transfer and actively sought to avoid such problem. [19] Petitioners also contend that under Minnesota state law, Western did not assume the liabilities of McO. Petitioners, *392 in the alternative, argue that any calculation of section 357(c) gain should be reduced by the $ 100,000 certificate of deposit pledged as security on the indebtedness. Respondent argues that in December 1981: (1) The equipment was security for the full amount of indebtedness; (2) petitioners did not have any agreement with Wayzata Bank releasing any security interest in the transferred equipment; (3) petitioners' personal assumption of a portion of Western's indebtedness in September 1982, is irrelevant herein; and (4) McO did not transfer the $ 100,000 certificate of deposit to Western. Except for the last contention, we agree with respondent. *393 On December 31, 1981, McO transferred equipment with an adjusted basis of $ 763,354.23 to Western. [20] As of that date, the unpaid principal balance of the loans obtained to purchase the equipment transferred was $ 988,008.48. As of December 31, 1981, there was no release of any part of Wayzata Bank's security interest in the equipment. In September 1982, Wayzata Bank released part of its security interest in the equipment. The total outstanding indebtedness to Western was restructured to provide that Owen and McEachron individually assumed personal liability for a portion of the indebtedness. *394 [21]
The record does not support petitioners' contention that as of December 31, 1981, an *395 oral agreement existed between petitioners and Wayzata Bank reducing the indebtedness to which the equipment was subject. Petitioners' self-serving testimony is generally unsupported in the record. Although we may consider books and records to be reflective of a transaction, they may be accorded little probative weight and are not necessarily determinative, [22] especially here where the evidence reflects that the "recorded event" had not taken place. The fair market value of the equipment as of December 31, 1981, and September 1, 1982, is not ascertainable from the record. Wayzata Bank may have been less likely to reduce its security interest in the equipment at the earlier date, and Berg stated that the security interest was not reduced until September 1982. We find petitioners' contention that the September 1982 agreements should be treated as retroactive to December 1981 to be without merit. Although the "step transaction doctrine" is available to taxpayers in appropriate circumstances, the steps should be part of a single transaction if they are to be part of an integrated scheme. [23] Under *396 the facts of this case, the step transaction doctrine does not afford relief to petitioners. Petitioners provided documentation concerning the December 31, 1981, equipment transfer which was prepared after respondent began his audit and requested documentation. The Internal Revenue agent conducting the audit requested information around June 24, 1982, and received the Transfer agreement and modification on July 14, 1982. Hay testified that the agreements were prepared sometime in June or July of 1982, and the loan bifurcation was not executed until September 2, 1982. We find that timing of the drafting of the agreements does not support petitioners' position. Cf. Hoover Co. v. Commissioner,72 T.C. 206, 248 (1979); Legg v. Commissioner,57 T.C. 164, 169 (1971), affd. per curiam 496 F.2d 1179 (9th Cir. 1974); Acro Manufacturing Co. v. Commissioner,39 T.C. 377, 385 (1962), affd. 334 F.2d 40 (6th Cir. 1964), cert. denied 379 U.S. 887 (1964). Wayzata Bank first agreed to the reduction of the security interest in September 1982. Under these circumstances, we conclude that the purported Transfer *397 agreement and modification thereof were not part of the December 1981, equipment transfer, and accordingly should not be treated retroactively or as part of a step transaction. [23]
Finally, we dismiss petitioners' contention that under Minnesota state law, the property in question passed without Wayzata Bank's security interest. We do not need to discuss whether these circumstances fit one of the exceptions to Minnesota state law which provides, generally, that a transferee is not liable for the debts and liabilities of the transferor, [24] because all that is necessary under section 357(c) is that the property remain subject to the debt. There is no dispute about the fact that the equipment was subject to Wayzata Bank's security interest. Petitioners' argument is that the security interest in the amount in excess of basis was not transferred; petitioners contend that the security interest in excess of basis disappears. Minnesota state law does not support this bifurcation. *398 We agree with petitioners, however, that the $ 100,000 certificate of deposit should be offset against the gain determined under section 357(c). In May 1981, petitioners pledged the certificate of deposit as additional security for the indebtedness. [25] Although the certificate of deposit was a personal asset of petitioners, rather than an asset of McO's, we conclude that such offset is appropriate because: (1) the record indicates that Wayzata Bank accepted such certificate of deposit as a reduction the face amount of the outstanding indebtedness, and (2) notations on various certificates of title apparently included such certificate of deposit in computing total outstanding indebtedness. To reflect the foregoing, Decisions will be entered under Rule 155.
APPENDIX A
Description
Date Acquired
Cost
Drilling Rigs:
D10     6/1/80 $ 156,163
D20     6/1/80 155,056
D30     7/10/80 152,612
D40     7/10/80 156,273
D50     5/71 174,965
D60     5/81 174,965
Total
970,034
Water Trucks:
W11     6/1/80 34,939
W21     6/7/80 34,939
W31     6/1/80 34,939
W41     I6/19/80
34,939
W51     5/81 --
W61     5/81 --
W71     5/81 --
W81     5/81 123,612
Total
263,368
Pick-Up Trucks and
Miscellaneous:
P12     3/5/80 7,512
P22     3/5/80 7,512
Misc.   3/80 1,644
P32     5/80 7,631
P42     5/80 7,631
Misc.   6/80 1,276
Blazer  5/80 3,000
P52     4/81 --
P62     4/81 --
Misc.   4/81 18,556
Total
54,762
Total Equipment Cost *
$ 1,288,164
*399 Footnotes
1. These cases were consolidated for purposes of trial, briefing and opinion, by a Motion to Consolidate granted Oct. 18, 1984. ↩
2. Due to concessions by petitioners, taxable year 1979 is no longer in controversy.↩
3. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years at issue. All rule references are to the Tax Court Rules of Practice and Procedure. ↩
4. The McEachrons filed a Form 1040X, amended joint income tax return, for 1980. ↩
5. The seismic drilling business is a type of geophysical exploration. Essentially, the business involves drilling a number of shallow holes on a mineral property and then determining whether or not an oil reserve is present. ↩
6. Petitioners each owned 50 percent of Western Companies, Inc. (WCI), a corporation organized under North Dakota law, and in the business of providing consulting services for the acquisition and disposition of businesses. ↩
7. Various pieces of equipment were covered by different leases. The leases provided for differing notice periods, and some required written notice. The equipment rental charge was $ 6,000 per month under some agreements and $ 7,500 per month under others. Some of the lease agreements were modified by a letter dated Dec. 28, 1980 (but not effective until Feb. 1, 1981), such that a daily rental of $ 260.87 (with a maximum of $ 6,000 per month) would be charged and the notification of cancellation period would be reduced to 24-hours notice. ↩
8. McO acquired various pieces of equipment in 1980 and 1981, as detailed in Appendix A of this opinion. McO purchased the equipment after Western Exploration, Inc. (Western), entered into contracts under which specific equipment would be needed. ↩
9. Petitioners were considered to be significant bank customers, and individually had large deposits in Wayzata Bank and Trust Co. (Wayzata Bank). ↩
10. The parties have agreed that Wayzata Bank possessed a "security interest" in the equipment. The dispute here concerns only the extent to which such security interest was transferred. ↩
11. On May 26, 1981, petitioners entered into an agreement consolidating two prior outstanding loans, in the amounts of $ 300,463.41 and $ 303,375.93, and a new loan in the amount of $ 404,800, for a total consolidated loan of $ 1,008.639.34. On May 26, 1981, petitioners and Wayzata Bank also entered into a security agreement covering the equipment at issue. On May 29, 1981, Wayzata Bank obtained a $ 100,000 certificate of deposit as additional collateral on the above noted loans. On Aug. 5, 1981, McO entered into a Security Agreement with Wayzata Bank pledging the $ 100,000 certificate of deposit. ↩
12. Wayzata Bank viewed the certificate of deposit as reducing the total outstanding indebtedness, and in fact, made informal notations reflecting the certificate of deposit on the various certificates of title related to the equipment. ↩
13. Schedule A to this agreement, the list of equipment secured, was not offered into evidence by the parties. An identical Third Party Pledge Agreement, dated Mar. 22, 1982, was offered and received. The Mar. 22, 1982, agreement contains a schedule listing the equipment secured, which we assume is the same as the Dec. 30, 1981, Schedule A, or that it would have had no effect on the outcome of this matter. ↩
14. Sanders v. Commissioner,T.C. Memo, 1984-511, affd. without published opinion 770 F.2d 174↩ (11th Cir. 1985). 15. Owen testified that a drilling rig had never been leased to third parties, but that some equipment (i.e., water or pickup trucks) had been leased to employees or other third parties. Owen could not recall the amounts or dates of any such rentals, produce any documentation supporting such leases, and termed such transactions as "relatively insignificant." ↩
16. Generally, for investment tax credit purposes, the useful life of property is determined with reference to sec. 167 or sec. 168. See sec. 46(c)(2) and sec. 46(e)(3). McO utilized useful life and class life periods of five and three years in computing the depreciation. Citing Corkery v. Commissioner,T.C. Memo. 1985-311, and Fredricks v. Commissioner,T.C. Memo. 1983-725, respondent argues that because petitioners were advised to sell the equipment prior to the expiration of 50 percent of its useful life, for purposes of sec. 46(e)(3), the useful life of the equipment is limited to the actual time period that petitioners owned the equipment. The record supports the conclusion, however, that the equipment transfer (to the lessee) was made because of unforeseeable circumstances, in an attempt to integrate the business before selling it as a whole. Because of our conclusions, infra,↩ we do not have to give consideration to this argument. 17. Even assuming that the useful life of the equipment was five or three years as claimed, the parties disagree as to whether the equipment was transferred prior to the expiration of 50 percent of such time. the terms of some original leases were modified by letter dated Dec. 28, 1980 (see note 8, supra↩), and petitioners interpret this letter as cancelling the original leases and creating new leases between the parties. Petitioner does not aggregate the time period for the original and "modified leases," and argues that all leases were for less than 50 percent of the useful life of the property. We disagree with petitioner on both grounds. First, the letter modification of the original leases was just that. The letter states that the original agreements were to remain in effect, except as noted. This does not amount to cancellation of a lease for purposes of sec. 46(e)(3)(B). Even if it did, under these circumstances it would be appropriate to aggregate the lease terms. We not that this issue is not determinative in any event. 18. Of course we realize that in some areas a transaction between related entities will not be respected when that transaction is adopted solely for tax motivated reasons. We also note that intent to qualify for benefits under sec. 46(e)(3) is not determinative (compare Sallies v. Commissioner,83 T.C. 44↩ (1984); the test is "reasonable contemplation" that the property will be leased to third parties. 19. Petitioners attempt to analogize the issue at hand to issues presented concerning "subject to" and "assumptions" of debts and "wrap-around mortgages" under sec. 453. Petitioners contend that sec. 453, in a Hunt v. Commissioner,80 T.C. 1126 (1983), situation, permits a seller to remain independently liable for the "wrapped" indebtedness. In so doing, however, sec. 453 governs only when gain is to be recognized not the amount of gain to be recognized. Sec. 357(c), on the other hand, operates to cause recognition of an amount↩ of gain. 20. Apparently, the discrepancy between the adjusted basis per McO's books ($ 781,862.23) and as determined by respondent in his notice of deficiency ($ 763,354.23) resulted from a change in 1981 to the ACRS recovery period for pick-up trucks from five years to three years. Petitioner has not placed in dispute respondent's determination of McO's adjusted basis in the equipment, and accordingly we find that McO's adjusted basis in the equipment transferred to Western is $ 763,354.23 as determined by respondent. See Rule 142(a); Welch v. Helvering,290 U.S. 111↩ (1933). 21. Berg testified as follows: Q. [A]re you aware of the transaction with the bank whereby the note was bifurcated to provide that Western * * * was only responsible for approximately $ 780,000 of the indebtedness, and the remaining indebtedness was split equally between Owen and McEachron? A. Yes, I am aware of that. * * * Q. In essence, do those three copies of the notes [dated September 3rd, 1982] represent the transaction whereby the loan was bifurcated in the fashion described in the previous testimony. A. I'm sorry, I didn't look at the second and third pages. They indicate a loan to Steve McEachron of 102,913 and a similar amount to Bill Owen, and that indicates how we restructured the debt. Q. Mr. Berg, what was your understanding with regard to the purpose of this restructuring? A. Well, the understanding was Mr. Owen and Mr. McEachron came to us and asked if individually they could assume portions of the overall indebtedness indicated on those notes, the 102,000 each, and we said, yes, and therefore the obligation of Western * * * was reduced to $ 780,000. ↩
22. Compare Burwell v. Commissioner,T.C. Memo. 1985-583↩. 23. For example, see Yamamoto v. Commissioner,73 T.C. 946, 953 (1980), affd. 672 F.2d 924↩ (9th Cir. 1982). 24. Although Minnesota state law provides, generally, that a transferee is not liable for the debts and liabilities of the transferor, the general rule is inapplicable, inter alia, where the transferee expressly or impliedly agrees to assume the transferor's debts and liabilities. J. F. Anderson Lumber Co. v. Myers,296 Minn. 33, 206 N.W. 2d 365, 368 (1973); see also Minn. Stat. section 302A.661↩ (1984). 25. A the same time, petitioners also personally guaranteed the indebtedness. This personal guarantee is not effective to increase their basis in the transferred assets or otherwise affect any gain determined under sec. 357(c). See Rosen v. Commissioner,62 T.C. 11 (1974), affd. without published opinion 515 F.2d 507↩ 93d Cir. 1975). *. Includes a rounding error of $ 4. [See Ex. 12-L and 16-P]↩